IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL J. AQUILINO, JR.,<br>    Plaintiff, | :<br>:<br>: | CIVIL ACTION |
| v. | :<br>: | |
| SOLID WASTE SERVICES, INC., ET AL,<br>    Defendants. | :<br>:<br>: | NO. 2:07-cv-00928-LDD |

MEMORANDUM AND ORDER

AND NOW, this 12th day of June 2008, upon consideration of Plaintiff's Motion for Summary Judgment (Doc. No. 14); Defendants Solid Waste Service, Inc. d/b/a J.P. Mascaro & Son and J.P. Mascaro & Sons and Keystone Health East HMO 515 Plan's (collectively, "Defendants") Motion for Summary Judgment Pursuant to Fed.R.Civ.P. 56 (Doc. No. 16); Memorandum of Law in Support of Defendants' Motion for Summary Judgment (Doc. No. 17); Plaintiff's Reply in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 18); Plaintiff's Reply Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Doc. No. 19); Defendants' Answer to Plaintiff's Motion for Summary Judgment (Doc. No. 20); Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 21); it is hereby ORDERED that Plaintiff's Motion for Summary Judgment (Doc. No. 14) is GRANTED and Defendants' Motion for Summary Judgment (Doc. No. 16) is DENIED.

I. Factual and Procedural History

The relevant facts in this matter are largely undisputed by the parties. On August 13, 2001, Plaintiff Michael J. Aquilino ("Aquilino") was hired by Solid Waste Services, Inc., doing business as J.P. Mascaro & Sons ("Mascaro"), as a recycling driver at its Bridgeport, Pennsylvania division. Mascaro is a fully integrated solid waste company that provides various waste removal services. Following a ninety day probationary period, Aquilino began to participate in the health insurance plan offered by Mascaro to its employees–the J.P. Mascaro & Sons Keystone Health Plan HMO 515 Plan (the "Keystone Plan"), which was administered by Mascaro. As a condition to being a member of the Keystone Plan, Aquilino was required to make monthly contributions to the Keystone Plan. These required contributions were directly deducted by Mascaro from Aquilino's weekly pay checks.

On April 30, 2002, Aquilino sustained a work-related injury, when a metal pole struck his head. Due to this injury, Aquilino was unable to work and began to receive workers' compensation benefits. Initially, Aquilino's contributions to the Keystone Plan were deducted directly from his workers' compensation benefit checks. In a letter dated October 18, 2002, however, Mascaro's director of human resources wrote to Aquilino indicating that Mascaro would no longer deduct the required contribution directly from his workers' compensation benefit check. Instead, the letter indicated that contributions would now need to be made by Aquilino directly to the company every other week. The letter further provided the amount of the bi-monthly remittance and the address to which the contribution was to be sent. Aquilino began making these payments in mid-December 2002. On December 17, 2002, Aquilino returned to work on light duty and once again his contributions to the Keystone Plan were deducted directly

2

from his weekly pay check.[1]  On December 31, 2002, Aquilino received another letter from Mascaro's director of human resources informing him of an increase in his monthly health insurance contribution.  Besides informing Aquilino of the increased monthly contribution, the letter also noted to whom Aquilino was to send his monthly contribution.  Additionally, the letter noted that '[f]ailure to make your monthly payments in this new amount will result in your loss of benefits and will subject you to COBRA enrollment."  (Pl.'s Mot. for Summary Judgment, Exhibit F).

On June 2, 2004, Aquilino became unable to work and began to once again receive workers' compensation benefits.  Unlike previously when Aquilino received workers' compensation benefits, Mascaro neither deducted Aquilino's monthly contributions from his workers' compensation benefits nor provided him with a letter indicating how he should continue to make his contributions.  Though Aquilino did not make any contributions to the Keystone Plan after June 2, 2004, Mascaro continued to provide him health insurance through November 2004.  On December 1, 2004, Mascaro terminated Aquilino's health insurance.  From the June 2, 2004 through December 1, 2004, Aquilino did not receive from Mascaro or the Keystone Plan any form of written or oral notice that informed him (a) when and where to make his monthly health insurance contributions, (b) that he was in arrears with respect to his health insurance contributions, (c) that his health insurance would end on November 2004 or (d) that he would be eligible for continuation coverage under COBRA.  Additionally, Aquilino did not receive any notice from either the Keystone Plan or Independence Blue Cross that his health insurance had

---

[1] Because Aquilino failed to send in the checks for his contribution to the Keystone Plan for a certain time during his original absence, Aquilino made further direct payments to Mascaro through February 2002.

been terminated on December 1, 2004.

In connection with Aquilino's second leave of absence, an internal Mascaro form entitled "Employee Change in Status Form", dated June 16, 2004 and June 21, 2004, records that Aquilino went from a "dispatch" job to "Workmen's Comp" on June 2, 2004.  This form has a hand written notation indicating "Send Premium letter."  Additionally, in an email dated January 17, 2005, more than two months after Mascaro terminated his health insurance coverage, Mascaro's director of human resources wrote to another Mascaro employee stating:

> I need you to see if a letter to Michael Aquilino was ever sent out for his leave of absence back in June 2004 for his continuing insurance.  If a letter wasn't sent out, please send one out right away.  In the letter state that he owes us for January premiums and premiums going forward.  Also state that if they are not received by 1/24/05 we will cobra him and take him off of the insurance.

(Pl.'s Mot. for Summary Judgment, Exhibit G).  Furthermore, a "Employee Change in Status Form", dated January 18, 2005 and January 24, 2005, contains a hand written notation next to an entry for "Type of Termination" that states "COBRA."  Though these internal documents make repeated reference to Mascaro's intent to send notices to Aquilino related to his health care contributions and his eligibility for continuation coverage pursuant to COBRA, no such notices were ever sent.

On January 19, 2006, while out on workers' compensation, Aquilino experienced a severe allergic reaction that required him to be hospitalized through January 23, 2006.  It was during this hospital stay that Aquilino learned for the first time that his health insurance had been terminated.  As a consequence of the hospitalization, Aquilino incurred medical bills totaling $44,423.10.

On January 29, 2007, Aquilino sent a letter to Mascaro requesting certain information concerning the Keystone Plan, including copies of the summary plan description, certain plan documents and the insurance policy. This letter was received by Mascaro on January 31, 2007. In response to this request, Mascaro sent, on February 28, 2007, the name of the plan administrator, the name of the plan sponsor, the name of plan, certain co-payment information, and a summary of benefits. Because Mascaro did not have the summary plan description, the plan documents or the insurance policy, it requested these documents from its insurance broker. Mascaro's director of human resources received these documents sometime during March, but did not forward them to Aquilino until May 25, 2007 because these documents were "misplaced [ ] on [his] desk" and he "got involved in other things, put if off to the side, didn't do it immediately, and again just an oversight, but I did not mail it when directed." (Defs.' Mot. for Summary Judgment, Exhibit B).

In its motion for summary judgment, Aquilino claims that defendants violated certain provisions of the Comprehensive Omnibus Budget Reconciliation Act of 1985 ("COBRA") by failing to provide Aquilino with timely notice of the termination of his health insurance coverage upon the occurrence of a "qualifying event" and by failing to provide certain information about the Keystone Plan as required under 29 U.S.C. § 1024(b)(4). Defendants in their response to Aquilino's motion for summary judgment and in their own cross-motion for summary judgment argue that COBRA notification was not required because Aquilino's loss of coverage was not due to a "qualifying event" as defined by COBRA, but rather due to Aquilino's failure to pay his required health care insurance contributions.

II. Discussion

*A. Standard of Review*

The granting of a motion for summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on the motion, the Court must draw all reasonable inferences in the light most favorable to the nonmoving party, and "may not weigh the evidence or make credibility determinations." Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); Anderson, 477 U.S. at 255. See id. at 256. Once a moving defendant has demonstrated an absence of genuine issues of material fact, the plaintiff must then establish, through competent evidence, the existence of each element on which he bears the burden of proof. See J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990).

*B. COBRA–Qualifying Event*

Under COBRA, "[t]he plan sponsor of each group health plan shall provide . . . that each qualified beneficiary who would lose coverage under the plan as a result of a *qualifying event* is entitled, under the plan, to elect, within the election period, continuation coverage under the plan." 29 U.S.C. § 1161(a) (emphasis added). The purpose of section 1161(a) "is to prevent individuals covered under their employer's [Employee Retirement Income Security Act ("ERISA")] plan from having no group health coverage at all from the time a qualifying event terminates their coverage to the time in which they are able to secure some other coverage." Austell v. Raymond James & Associates, Inc., 120 F.3d 32, 33 (4th Cir. 1997). Once a

qualifying event has occurred, COBRA requires that the administrator of a plan provide the employee notice of his or her rights to extend health insurance coverage under COBRA. See 29 U.S.C. § 1166.

For the purposes of COBRA, a qualifying event "means with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary . . . (2) [t]he termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment." 29 U.S.C. § 1163.

As previously noted, the material facts in this matter are undisputed. Aquilino is a qualified beneficiary under the Keystone Plan, who would be entitled to receive notice pursuant to COBRA upon the occurrence of a qualifying event. On June 3, 2004, Aquilino went out on workers' compensation and, due to this leave of absence, the hours he worked were reduced from around forty to zero. Though Mascaro did not receive health plan contributions from Aquilino after June 3, 2004, Mascaro maintained his health insurance coverage until December 1, 2004. From June 3, 2004 through December 1, 2004, Aquilino did not receive any type of notice from either Mascaro or the Keystone Plan that (a) he would now be required to send his monthly contributions directly to Mascaro, (b) that Mascaro was paying his contributions from June 2004 through November 2004, (c) that his insurance coverage would be terminated at the end of November 2004 or (d) that he would be eligible for continuation coverage under COBRA.

As the material facts in this action are uncontested, the task before this Court is the proper application of the law to these particular facts. Accordingly, the principal issue is whether there occurred a qualifying event such that Aquilino was entitled to notice of his right to continuation

coverage under COBRA.  Defendants argue that no qualifying event occurred because Aquilino's health insurance coverage was terminated because of his failure to pay the required contributions and not because of a qualifying event.  The Court disagrees.

As noted, COBRA defines a qualifying event to include "any of the following events, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary."  29 U.S.C. § 1163.  A "reduction of hours of the cover employee's employment" is then set forth as one such qualifying event.  See id.  Here, it is clear that Aquilino's absence after June 3, 2004 due to his disability is a reduction of hours for the purposes of COBRA.  See Mehmen v. Collin County, 2007 WL 3389929, at *4 (E.D. Tex. Nov. 13, 2007).  This conclusion is made plain by regulations adopted by the Department of Treasury that provide, in relevant part, that

> a reduction of hours of a covered employee's employment occurs whenever there is a decrease in the hours that a covered employee is required to work or actually works, but only if the decrease is not accompanied by an immediate termination of employment.  This is true regardless of whether the covered employee continues to perform services following the reduction of hours of employment.  *For example, an absence from work due to disability, a temporary layoff, or any other reason (other than due to leave that is FMLA leave; see § 54.4980B-10) is a reduction of hours of a covered employee's employment if there is not an immediate termination of employment.*

Treas. Reg. § 54.4980B-4(e) (emphasis added)[2].

---

[2] Though the Court does not find the term "reduction of hours" in this context ambiguous, to the extent there is ambiguity, a court is required to defer "to an agency's reasonable interpretation of an ambiguous statute entrusted to its administration."  Packard v. Pittsburgh Transp. Co., 418 F.3d 246, 252 (3d Cir. 2005) (citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984)).  Furthermore, at a minimum these regulations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).  Accordingly, these interpretations are entitled to deference under Skidmore to the extent they are persuasive.  George Harms Construction Co., Inc. v. Chao, 371 F.3d 156, 161 (3d Cir. 2004) (citing Madison v. Resources for Human Development, Inc., 233 F.3d 175, 186 (3d Cir. 2000)).

The question then is whether this reduction of hours caused a loss of coverage.  Initially, in order to determine the occurrence of a qualifying event, "a loss of coverage need not occur immediately after the [qualifying] event, so long as the loss of the coverage occurs before the end of the maximum coverage period.  Treas. Reg. § 54.4980B-4(c).  Furthermore, "[t]o 'lose coverage' under a group health plan means to cease to be covered under the same terms and conditions as in effect immediately before the qualifying event."  Collins v. Strategic Health Care Management Services, Inc., 1992 WL 92099, at *5 (N.D. Ill. Apr. 28,1992) (citing Chacosky v. The Hay Group, 1991 WL 12170, 1991 U.S. Dist. LEXIS 1170 (E.D. Penn. Jan. 31, 1991); see also Treas. Reg. § 54.4980B-4(c) ("For this purpose, to lose coverage means to cease to be covered under the same terms and conditions as in effect immediately before the qualifying event.").  From the time that Aquilino joined the Keystone Plan his monthly contributions were directly deducted from his paychecks.  After his initial injury on April 30, 2002, Mascaro continued to deduct these monthly contribution directly from his workers' compensation benefits.  These deductions continued until October 12, 2002, when Mascaro notified Aquilino that he would need to pay his contributions directly to Mascaro.  When Aquilino returned to work, Mascaro once again began to deduct his contributions directly from the paycheck.  There is no suggestion in the record that Aquilino made any request that his contributions once again be deducted from his paycheck or that Mascaro required him to elect to have these contributions directly deducted from his paycheck.  When Aquilino went out on workers' compensation on June 3, 2004, however, Mascaro neither continued to deduct these contributions or advised Aquilino of the method by which he was to make these required contributions.  The Court finds that the method and means by which a plan participant is required to make contributions to a

Case 2:07-cv-00928-LDD   Document 23   Filed 06/13/08   Page 10 of 16

health plan is an implicit term and condition of the health plan.  Accordingly, a change in the method or means by which an employee is required to make contributions to a health care plan that occurs as a result of a reduction in hours qualifies as a loss of coverage for the purposes of COBRA.  Here, it is clear that the change in the method by which Aquilino was to remit his health insurance contributions resulted in Aquilino's loss of coverage.  And, the change in the method of payment was the direct result of Aquilino's reduction in hours.

This conclusion is supported in part by the language of the benefit election form signed by Aquilino when he first join the Keystone Plan that provides, in relevant part, that "[b]y signing this form, I am stating that I understand and agree to the following: (1) I authorize the above selections and agree to salary reductions to fund pre-tax contributions and/or after-tax contributions if needed." (Pls.' Mot. for Summary Judgment, Exhibit B).  Additionally, this interpretation is consistent with the intent of Congress in enacting COBRA to protect against the loss of health care coverage." Smith v. Hartford Ins. Group, 6 F.3d 131, 140 n.10 (3d Cir. 1993) (noting that COBRA was adopted out of "concern[ ] with reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay.") (quoting H.R. Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986 U.S.C.C.A.N. 42, 579, 622).  In light of COBRA's remedial purpose, an interpretation that would permit employers to terminate an employee's health care coverage by changing a material term upon the reduction of an employee's hours without notice is particularly inappropriate.  Furthermore, the Court's conclusion that the method and means of payment is a term and condition to the health care plan is tacitly supported by Mascaro's internal documents that repeatedly indicate the need to advise Aquilino of the new

manner in which he will need to make his contributions to the Keystone Plan.

To support their argument, Defendants cite to Glandorf v. W.G. Products Co., Inc., 31 Fed App. 772 (3d Cir. 2002). This case, however, is not applicable to the facts of this case. In Glandorf, the Third Circuit held that an employee was not entitled to COBRA notification where the employer's health insurance plan was terminated due to the employer's failure to pay its health care premiums. The Third Circuit noted that COBRA does not create an obligation for an employer to maintain a health insurance plan, and if a employer's health care plan is cancelled or terminated, an employer is not required to provide COBRA notification or extend continuation coverage to any employee. Because there is no allegation that Mascaro terminated its health care plan, this case is not applicable. Here, where there has been a change in the terms and conditions of an employee's health care plan due to a reduction of hours, and but for this reduction of hours the material change would not have occurred, this is a qualifying event for the purposes of COBRA.[3] Accordingly, the Court finds that Aquilino's reduction of hours which resulted in a loss of coverage entitled Aquilino to notification pursuant to 29 U.S.C. § 1166(a)(4).

*C. Statutory Penalties for Failure to Provide COBRA Notice*

29 U.S.C. § 1132(c)(1) provides, in relevant part, that:

---

[3] In this case, there are two events that could be considered a loss of coverage for the purposes of COBRA. This first occurred after June 3, 2004, when Aquilino's monthly contribution was neither deducted from his paycheck from Mascaro or from his workers' compensation benefits. The second occurred on December 1, 2004 when Mascaro terminated Aquilino's health care coverage. For the purposes of COBRA, a loss of coverage need not occur immediately after a qualifying event to trigger the notice requirements. See Gaskell v. Harvard Coop. Soc'y, 3 F.3d 495, 500-01 (1st Cir. 1993); Treas. Reg. § 54.4980B-4(c) ("For the purposes of this paragraph (c), a loss of coverage need not occur immediately after the event, so long as the loss of coverage occurs before the end of the maximum coverage period.") Because the change in the terms and conditions of Aquilino's health care coverage directly resulted in the actual termination of his health care benefits on December 1, 2004, the Court will employ the later event as the qualifying event requiring notification. This result is tacitly acknowledged by Mascaro's internal documents that repeatedly note the need to provide Aquilino with COBRA notification if his contributions are not received.

> [a]ny administrator (A) who fails to meet the requirements of paragraph (1) or (4) of section 1166 of this title . . . with respect to a participant or beneficiary . . . may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.[4]

In determining whether civil penalties are appropriate, a court considers the "bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made and documents withheld, and the existence of any prejudice to the participant or beneficiary." Romero v. SmithKline Beecham, 309 F.3d 113, 120 (3d Cir. 2002) (quoting Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 90 (2d Cir. 2001)). The decision whether to grant statutory penalties and the amount of the penalty is entirely within this Court's discretion. See Hennessy v. Fed. Deposit Ins. Corp., 58 F.3d 908, 924 (3d Cir. 1995). The purposes of these penalty provisions is to "induce compliance with statutory notification requirements and to punish non-compliance." Lloynd v. Hanover Foods Corp., 72 F. Supp. 2d 469, 479-80 (D. Del. 1999) (citing Van Hoove v. Mid-America Bldg. Maintenance, Inc., 841 F. Supp. 1523, 1536 (D. Kan. 1993). Based on the record, statutory penalties are appropriate in this case. Though the record does not reveal that Defendant acted in bad faith by failing to notify Aquilino with respect to his COBRA rights, it is clear that Defendants showed a casual indifference and general disregard towards Aquilino in failing to ever notify him of the status of his health insurance coverage. Though this failure to notify may have not been intentional, it is precisely the type of behavior that the civil penalties of COBRA were enacted to punish. Furthermore, Aquilino was extremely prejudiced by Defendants' failure to provide COBRA

---

[4] The maximum amount of civil monetary penalty was increased from $100 per day to $110 per day. 29 C.F.R. § 2575.502C-1.

notice.  Upon the termination of his participation in the Keystone Plan on December 1, 2004, Aquilino was left without health insurance without previously receiving any form of notice.  The complete lack of any type of communication from Defendants to Aquilino about the status of his health insurance or his rights to continue coverage under COBRA unjustifiably placed Aquilino in an extremely precarious position.  Specifically, Aquilino was not afforded the most basic choice provided by COBRA.  The choice to either take accept the continuation coverage or make alternate arrangements.  Instead, Aquilino continued to conduct his affairs upon the reasonable, but false, assumption that he still had health insurance.  In a world of high-priced health care, the possibility that an individual can unwittingly be left completely without health insurance coverage is highly troublesome.  Accordingly, the Court finds that Mascaro's conduct in this case warrants statutory penalties of $50 per day.  This penalty will be applied to 415 days.  This is the number of days between December 1, 2004, date that Mascaro terminated Aquilino's coverage, through January, 19 2006, the date that Aquilino first became aware that he no longer had health insurance.  Furthermore, Defendants are liable for the medical fees incurred by Aquilino in connection with his hospitalization in January 2006.  See 29 U.S.C. § 1132(c)(1); Lloynd v. Hanover Foods Corp.,72 F. Supp. 2d 469, 479 (D. Del. 1999) (awarding net medical expenses after noting that one purpose of ERISA's civil enforcement provision is to put the plaintiff in the same position as he would be absent a violation.)  Plaintiff has set forth that net medical expenses in this case are $41,573.10.  This figure has not been contested by Defendants.

     D.  *Notice Letter*

In addition to failing to provide notice upon the occurrence of a qualifying event, Aquilino also alleges that Defendants failed to timely provide him with information he requested

with respect to the Keystone Plan in violation of ERISA. Specifically, 29 U.S.C. § 1024(b)(4) provides in relevant part that "[t]he administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated." 29 U.S.C. § 1024(b)(4). If a plan administrator:

> fails or refuses to comply with a request for any information which such administrator is required by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

29 U.S.C. § 1132(c)(1)(B).[5] In determining whether civil penalties are appropriate for a failure to provided this information, the Court considers the same factors noted above. Romero, 309 F.3d at 120. Aquilino made his request for various documents and certain information related to the Keystone Plan on January 29, 2007. This request was received by Mascaro on January 31, 2007 and it had until March 2, 2007 to timely reply to Aquilino's request. On February 28, 2007, Mascaro replied with the name of the plan administrator, the name of the plan sponsor, the name of plan, certain co-payment information, and a summary of benefits. Mascaro, however, did not provide Aquilino with the summary plan description, the plan documents or the insurance policy. These documents were not delivered until May 25, 2007, eight-four days after Mascaro was

---

[5] The maximum amount of civil monetary penalty was increased from $100 per day to $110 per day. 29 C.F.R. § 2575.502C-1.

required to deliver these documents and over two months after Aquilino had filed his complaint in this matter. Mascaro justifies these delays by noting it did not have the summary plan description, the plan documents of the insurance policy readily accessible and needed to request these documents from its insurance broker. It does not, however, explain when it originally requested these documents from its insurance broker or whether there were any special circumstances that justify why it took more than thirty days to receive these documents from its insurance broker. Furthermore, Mascaro's director of human resources explained that he received these documents sometime during March 2004 but failed to forward them to Aquilino until May 25, 2007. Mascaro notes that the human resource director misplaced them on his desk and then he "got involved in other things, put if off to the side, didn't do it immediately." Mascaro, however, does not offer any explanation of the delay from January 31 through March 2, 2007.

Though the Court does not find that Mascaro's behavior with respect to the delivery of the Keystone Plan documents was motivated by intentional malice or bad faith, Mascaro's behavior reflects its consistent pattern of failing to timely inform Aquilino of important matters related to his health insurance coverage. This pattern demonstrate an unacceptable level of causal indifference to Aquilino's rights and Mascaro's obligations. This indifference is highlighted by the failure of Mascaro to maintain important documents related to the Keystone Plan at its office and the failure of Mascaro to forward these documents for over four weeks once they were received. Because of this behavior and the inherent seriousness of matters related to an individual's health insurance, the Court finds Mascaro's behavior was unjustifiable and that sanctions are appropriate. Accordingly, this Court holds that Mascaro shall be fined $50 per day

from March 2, 2007 through May 25, 2007 for its failure to deliver to Aquilino the information he requested in connection with the Keystone Plan.[6]

An appropriate Order follows.

---

[6] In its motion for summary judgment, Plaintiff requests leave to file an application for attorney's fees and costs pursuant to 28 U.S.C. § 1132(g)(1). Plaintiff is hereby directed to file any application for attorney's fees and costs by no later than June 30, 2008. Defendants shall file their response by July 15, 2008. Once the application is fully briefed, this Court will consider the application.